**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HARRISON ENTERPRISES, L.P. and HARRISON SENIOR LIVING OF COATESVILLE, LLC | : : : : | |
| Plaintiffs, | : : | Civil Action No. |
| v. | : : | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | : : : | |
| Defendant. | : : | JURY TRIAL DEMANDED |

**COMPLAINT**

AND NOW COMES Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC (collectively "Plaintiffs" or "Harrison Senior Living"), by and through their attorneys, Flaster Greenberg PC, and file this Complaint against Defendant, Travelers Property Casualty Company of America ("Travelers"), and in support thereof, allege as follows:

**Brief Statement of the Case**

1.	This is a breach of contract and bad faith suit against Defendant, Travelers, which has not paid what it owes for a loss that occurred on November 13, 2024, at a residential senior living center owned and operated by Plaintiffs located in Valley Township, Coatesville, Pennsylvania. The loss was caused by a covered electrical arcing event that happened during a significant rain and thunderstorm.

2.	Travelers, without a reasonable basis, has refused to pay what it owes under its policy's Ordinance or Law Coverage, substantially delayed its adjustment and payment of the loss and damage, and refused to take a final coverage position in a timely manner.

15641385.7

3.      Travelers provided the Ordinance or Law Coverage to Plaintiffs, an Additional Coverage with a separate $1,000,000 policy limit, which was triggered for code related repairs needed to fix the electrical arcing damage. The repairs are mandated by Valley Township's Authority Having Jurisdiction ("AHJ") over building code enforcement to obtain permitting for the repair project and to comply with applicable building codes to allow Harrison Senior Living to continue its operations, as more fully described below.

4.      Plaintiffs seek monetary damages against Travelers to recover insurance proceeds under the Ordinance or Law Coverage in the applicable policy and to recover damages under Pennsylvania's bad faith statute, 42 Pa. C.S. § 8371, including interest, punitive damages, and attorneys' fees, due to Travelers' bad faith claims handling and improper coverage determination under the Ordinance or Law Coverage.

**The Parties**

5.      Plaintiff, Harrison Enterprises, L.P., is a limited partnership organized in the Commonwealth of Pennsylvania located at 300 Strode Avenue, Coatesville, Pennsylvania, 19320. Harrison Enterprises, L.P. is owned, in part, by Rose Valley Management Corporation, an S-Corporation incorporated in the Commonwealth of Pennsylvania, with its principal place of business located at 300 Strode Avenue, Coatesville, Pennsylvania. Harrison Enterprises, LP is also owned, in part, by individuals and trusts. None of the individuals and/or executors or beneficiaries of the trusts that have an ownership interest in Harrison Enterprises, L.P. are citizens of the State of Connecticut.

6.      Plaintiff, Harrison Senior Living of Coatesville, LLC, is a limited liability company organized in the Commonwealth of Pennsylvania located at 300 Strode Avenue, Coatesville, Pennsylvania, 19320. Harrison Senior Living of Coatesville, LLC is owned, in part,

2

15641385.7

by Rose Valley Management Corporation, which, as pled above, is incorporated in the Commonwealth of Pennsylvania with its principal place of business located at 300 Strode Avenue, Coatesville, Pennsylvania. Harrison Senior Living of Coatesville, LLC is also owned, in part, by Harrison Enterprises, L.P.  As pled above, Harrison Enterprises, L.P. is owned, in part, by Rose Valley Management Corporation, which is a citizen of Pennsylvania, and owned, in part, by individuals and trusts. None of the individuals and/or executors or beneficiaries of the trusts that have an ownership interest in Harrison Enterprises, L.P. are citizens of the State of Connecticut.

7.      Defendant, Travelers Property Casualty Company of America, upon information and belief, is incorporated in the State of Connecticut with a principal place of business located at 1 Tower Square, Hartford, Connecticut 06183.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC, and Defendant, Travelers Property Casualty Company of America, and the amount in controversy exceeds $75,000.

9.      Venue lies in this District in accordance with 28 U.S.C. §§ 1391(b)(2) and (c)(2) because the events giving rise to the insurance claim occurred in this District, the insured property is located within this District, and Travelers does business within this District, including soliciting and writing insurance policies to insureds such as Plaintiffs.

## The Travelers Policy

10.      Travelers issued an insurance policy to Plaintiff Harrison Enterprises, L.P. as the named insured, Policy No. P-630-5R368507-TIL-23, effective December 31, 2023, to December 31, 2024, which included, in relevant part, "Deluxe Property Coverage" and "Deluxe Business

3

Income (and Extra Expense) Coverage" ("the Policy"). A true and correct copy of the Travelers Policy is attached hereto as Exhibit A.

11.     Plaintiff Harrison Senior Living of Coatesville, LLC is also a named insured per the "General Purpose Endorsement" in the Policy. *Id.*

12.     The Policy provides "Deluxe Property Coverage" with a "Blanket Description of Coverage or Property" with a Limit of Insurance of $62,821,173. *Id.* The Policy also includes an "Additional Coverage & Coverage Extension" for Ordinance or Law Coverage with a Revised Limit of Insurance in the amount of $1,000,000. *Id.*

13.     The Ordinance or Law Coverage in the Policy provides:

****

**3.     Additional Coverages**

Each of the following Additional Coverages applies subject to the Limit(s) of Insurance stated in this Coverage Form unless a revised Limit of Insurance or *Not Covered* is indicated in the Declarations or the coverage is otherwise amended by endorsement:

****

**h.     Ordinance or Law Coverage**

(1)     In the event of covered direct physical loss or damage to a building that is Covered Property, the following coverages apply, but only with respect to that lost or damaged building:

(a) Coverage A – Coverage For Loss To The Undamaged Portion of The Building

We will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

(b) Coverage B – Demolition Cost Coverage

4

We will pay under Coverage B the cost to demolish the building and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged property.

(c) Coverage C – Increased Cost of Construction

We will pay under Coverage C the increased cost to:

(i) Repair or reconstruct damaged portions of that building; or

(ii) Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

when the increased cost is a consequence of enforcement of the minimum requirements of the ordinance or law.

This Coverage C applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance. This Coverage C does not apply if the building is not repaired, reconstructed or remodeled.

(2) The coverages described in (1) above apply only if the provisions in Paragraphs (a) and (b) below are satisfied and are then subject to the qualifications set forth in Paragraph (c) below:

(a) The ordinance or law:

(i) Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

(ii) Is in force at the time of loss.

But this Additional Coverage applies only in response to the minimum requirements of the

5

15641385.7

ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered.

(b)    The building either:

    (5)    Sustains direct physical loss or damage that is covered under this Coverage Part and such damage results in enforcement of the ordinance or law; or

    (ii)    Sustains both direct physical loss or damage that is covered under this Coverage Part and direct physical loss or damage that is not covered under this Coverage Part and the building damage in its entirety results in enforcement of the ordinance or law.

    If the building sustains direct physical loss or damage that is not covered under this Coverage Part, and such damage is the subject of the ordinance or law, then there is no coverage under this Additional Coverage even if the building has also sustained covered direct physical loss or damage.

(c)  In the situation described in (b) (ii) above, we will not pay the full amount of loss otherwise payable under the terms of Coverage A, B or C of this Additional Coverage. Instead, we will pay a proportion of such loss. The proportion of such loss that we will pay is the proportion that the covered direct physical loss or damage bears to the total direct physical loss or damage.

However, if covered direct physical loss or damage, alone, would have resulted in the enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverage A, B, or C of this Additional Coverage.

(3)  We will not pay under this Additional Coverage for:

6

(a)    Enforcement of any ordinance or Law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet rot or dry rot;

(b)    The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet rot or dry rot; or

(c)    Loss due to any ordinance or law that:

(i)    You were required by the ordinance or law to comply with before the loss, even if the building was undamaged; and

(ii)    You failed to comply with.

(4)    Exclusion C.1.h. Ordinance or Law Does not apply to the insurance specifically provided under this Additional Coverage.

(5)    The most we will pay under this Additional Coverage for loss with respect to all buildings lost or damaged in any one occurrence, regardless of the number of buildings involved, is $250,000 [not applicable here since Revised Limit is $1,000,000].

*Id.*

14.    Plaintiffs are entitled to coverage under the Policy's Ordinance or Law Coverage because there was covered physical loss or damage to covered property for which there are increased costs for repairs or construction to damaged and undamaged property and those increased costs are a consequence of the enforcement of the minimum requirements of the ordinance or law and the ordinance or law regulates the repairs or establishes zoning for the described premises. *Id.*

15641385.7

15.     Plaintiffs have claimed and proven $896,987.22 under the Policy's Ordinance or Law Coverage and Travelers has denied coverage for that claim without a good faith basis.

### General Factual Background Leading to This Lawsuit

16.     Plaintiffs own and operate a residential senior living center located at 300 Strode Avenue, Coatesville, Pennsylvania 19320, an insured location under the Policy ("Insured Property"). The facility is approximately 134,000 square feet with 111 living units. The Insured Property is located within Valley Township, Pennsylvania, and thus, subject to the building codes enforced in Valley Township.

17.     On November 13, 2024, during a significant rain and thunderstorm, the Insured Property suffered damage to electrical equipment and wiring from an electrical arcing event. The arcing caused, among other things, damage to the high voltage distribution system and electrical service lines connected to the outdoor substation. It resulted in observable damage such as melting and degradation to electrical feeds and charring/burning of electrical conduits and related electrical lines.

18.     Plaintiffs reported the claim to Travelers on December 16, 2024.

19.     Plaintiffs took immediate action to make temporary repairs to the damage at the Insured Property caused by the storm and arcing to safely restore and maintain power to the building and to avoid closing the building or moving the senior residents from the location.

20.     Travelers paid the cost of the temporary repairs in the amount of $6,030.90.

21.     Storm damage and electrical arcing are covered causes of loss under the Policy. *See* Ex. A. The cause of the loss was immediately evident and Travelers should have accepted coverage for the loss no later than January 2025, after its engineer inspected the loss, subject only to a damages assessment.

8

15641385.7

22.     Despite the fact that Travelers had prompt notice of the loss, had full access to the Insured Property to conduct an inspection and investigation of the loss, had its engineer inspect the damage on January 17, 2025, and had received all information it sought from Plaintiffs by that time, Travelers did not accept coverage for the loss until April 30, 2025 – over four months after the loss was reported to Travelers. A true and correct copy of the email Chris Swiatlon, Travelers' claims adjuster, sent to Plaintiffs, dated April 30, 2025, is attached as Exhibit B.

23.     Travelers failed to pay the undisputed amount of damages until fifteen months after the loss and nine months after receiving Plaintiffs' repair cost estimate.

24.     Eventually, Travelers paid Plaintiffs $845,309.00, which represents payment for the cost of permanent non-code-related repairs, less the applicable policy deductible. Travelers paid Plaintiffs $422,654.50 on February 3, 2026, for the undisputed actual cash value of the covered damage. Travelers then paid Plaintiffs $422,654.50 on March 16, 2026, representing the holdback it was required to pay as the Policy provided replacement cost coverage.

25.     Travelers denied coverage for and refused to pay the portion of the claim that relates to repairs required under the applicable building codes enforced in Valley Township. Thus, Travelers still owes Plaintiffs for code-related repairs in the minimum amount of $896,987.22.

26.     Travelers' refusal to pay Plaintiffs for the code-related repairs led to this present action.

**Travelers' Unreasonable and Bad Faith Conduct During the Claims Adjustment**

27.     Throughout the entire claim adjustment, from December 16, 2024, when Plaintiffs reported the loss to Travelers, through April 2026, when Travelers relied on a belated and deficient report from an engineer on the code-related repairs, Travelers engaged in repeated

unexplained, improper, and unreasonable delays and other bad faith conduct in investigating and adjusting this claim.

28.     Among other things, Travelers delayed in issuing a coverage decision, failed to pay Plaintiffs the undisputed amounts owed under the Policy for an unreasonable amount of time, failed to conduct an objective and/or independent investigation of the code-related repairs and/or whether coverage existed under the Policy for those repairs, and repeatedly misrepresented to Plaintiffs what information it required to trigger the Ordinance or Law Coverage.

29.     Furthermore, Travelers asked Plaintiffs for certain information and advised Plaintiffs that, if they provided the information, Travelers would accept coverage under the Policy's Ordinance or Law Coverage.

30.     However, as more fully described below, once Plaintiffs provided the exact information Travelers requested, Travelers, among other things, ignored the information entirely, failed to fully and fairly evaluate the information, including how that information affected coverage, and/or changed its position and advised Plaintiffs that it actually wanted different information to trigger the Ordinance or Law Coverage.

**Travelers' Delay in Issuing a Coverage Decision**

31.     Travelers initially delayed in sending an engineer to inspect the damage. In fact, Travelers' engineer's first inspection of the loss site at the Insured Property did not occur until thirty days after the loss was reported to Travelers. On January 17, 2025, Travelers' engineer, Randy Schubert ("Schubert") with JS Held, conducted a site inspection along with Greg Vietri ("Vietri"), Plaintiffs' electrician.

15641385.7

32.     Schubert either did not conduct a sufficient inspection on January 17, 2025, to determine the cause of the loss, or if he did, Travelers failed to act promptly after receiving the information Schubert provided because it took Travelers three months after Schubert's inspection to advise Plaintiffs that the loss was covered under the Policy.

33.     At the time of Schubert's inspection, the cause of loss was obvious and apparent so Travelers could have made an immediate decision as to whether the loss was covered under the Policy even if the cost of the needed repairs still had to be determined. Storm damage and electrical arcing are covered causes of loss under the Policy. *See* Ex. A.

34.     Schubert should have immediately advised Travelers after his inspection that the loss occurred from an electrical arcing incident due to the storm as reflected in the report he eventually issued many months later, and Travelers was obligated to accept coverage for the loss within a reasonable amount of time after the inspection.

35.     However, Travelers unreasonably delayed in providing Plaintiffs with a coverage decision.

36.     Even though the loss occurred on November 13, 2024, the claim was reported to Travelers on December 16, 2024, and Schubert inspected the loss site on January 17, 2025, Travelers did not accept coverage for the loss until April 30, 2025. On that same date, Travelers advised the insureds of the $1,000,000 in coverage provided under the Policy for Ordinance or Law Coverage. *See* Ex. B.

37.     As more fully described below, Travelers also delayed and avoided making a coverage decision as to the code-related repairs until many months after receiving a May 15, 2025, repair cost estimate from Vietri, Plaintiffs' electrician who is performing the repair work for the damage at the Insured Property.

11

15641385.7

38.     Upon information and belief, despite by April 2025 having accepted coverage for the loss and having its engineer inspect the loss site and damages, Travelers never prepared a scope of damages, scope of the needed repairs, or an estimate of the cost of repairs for either the code-related or non-code-related work.

<u>**Travelers' Unreasonable Delay in Paying the Undisputed Covered Damages**</u>

39.     After waiting months to issue a coverage decision, even though it had all relevant information to do so sooner, Travelers then failed to pay Plaintiffs any of the undisputed damages as required under the Policy until February and March 2026.

40.     In the months following the loss, Vietri made the temporary electrical repairs, conducted research to price out the new equipment and materials needed to permanently restore electrical service at the Insured Property after the damage, and prepared a repair cost estimate.

41.     Vietri's estimate, dated May 15, 2025, totaled $1,507,222. Vietri's estimate identified all repairs needed to safely re-energize the building, including repairs related to code compliance. Vietri's combined estimate was an initial estimate of the scope and cost of all repairs, subject to change to reflect fluctuations in market pricing of equipment and materials and/or if additional work was found to be needed. A true and correct copy of Greg Vietri's May 15, 2025, estimate is attached as Exhibit C.

42.     Vietri's estimate included work and equipment to install new 34 kV service to the site (PECO refused to service the site unless Harrison Senior Living moved to 34 kV service from 4 kV service), install a new transformer and switchgear to refeed the building's C Wing, refeed service to the building's D Wing as its exists, underground conduit work, install new metering and fuse switches, and perform all preparatory and site work needed for such a large project. *Id.*

12

43.    Vietri's May 15, 2025, estimate was sent to Travelers on or about the same date.

44.    Travelers generally contended that some of the repairs on Vietri's estimate related to building code compliance and were not covered, but made no effort to identify which repairs it claimed might not be covered.

45.    Travelers did not dispute then, nor has Travelers ever disputed, Vietri's scope of work or cost calculations for the work needed to fix the damage at the Insured Property. In fact, upon information and belief, Travelers relied on Vietri's estimates to calculate the value of the claim and the covered amounts owed to Plaintiffs under the Policy, and Travelers never prepared its own independent scope of repairs or repair cost estimate.

46.    Further, upon information and belief, Travelers never engaged in any attempt or analysis to delineate costs on Vietri's estimate between what it viewed as code-related repairs versus non-code-related repairs, which would have been necessary for Travelers to fully and fairly evaluate what repairs were covered under the Ordinance or Law Coverage.

47.    Since Travelers had accepted coverage for the claim on April 30, 2025, albeit belatedly since it knew the damage was caused by a covered cause of loss by January 2025 after its engineer's inspection, once Travelers had Vietri's May 15, 2025, estimate, Travelers should have identified the covered damages and should have paid the undisputed amount of those damages to Plaintiffs by no later than the end of May 2025.

48.    Travelers, however, failed to pay Plaintiffs for those undisputed repair costs until February and March 2026, ten months after accepting coverage, nine months after receiving Vietri's estimate, and fifteen months after the loss occurred.

49.    From May 2025, when Travelers received Vietri's estimate, to February 2026, when Travelers finally paid Plaintiffs the insurance proceeds Travelers admittedly owed,

Travelers could have – and should have – identified the repair costs on Vietri's estimate that it agreed were covered under the Policy, which would have included, at a minimum, all non-code-related repairs. Travelers never did that.

50.     Travelers delay in even attempting to determine what portions of Vietri's estimate were undisputed, and thus, should have been paid, left Plaintiffs without insurance proceeds to begin the work that needed to be done to safely repair and restore the electrical service for a senior living center with 111 residential units that housed elderly, vulnerable residents.

51.     Since Travelers made no effort to determine the undisputed portion of the claim and delayed issuing any payments to Plaintiffs, Vietri stepped in to help Plaintiffs recover the insurance proceeds they were owed so that the repair project could begin.

52.     Vietri broke down his May 15, 2025, estimate into two separate estimates – one that represents work for which Travelers accepted coverage, and one that represents work that is mandated by the AHJ due to building code requirements. Both estimates are dated December 22, 2025. Plaintiffs reserve their right to adjust or amend Vietri's estimates as the evidence develops and the work is performed.

53.     Both estimates signed by the insured were sent to Travelers on March 13, 2026.

54.     Vietri's December 22, 2025, estimate for non-code-related repairs totals $904,743.48. A true and correct copy of Greg Vietri's December 22, 2025, estimate for covered damages is attached as Exhibit D. As noted above, Travelers paid Plaintiffs $845,309 for the non-code-related repair costs on that estimate in February and March 2026.

55.     The portion of the claim at issue in this action relates to Vietri's second estimate dated December 22, 2025, totaling $896,987.22, which is for work related to repairs needed to comply with code as mandated by Valley Township's AHJ. A true and correct copy of Greg

14

Vietri's December 22, 2025, estimate for code-related work is attached as Exhibit E. As noted above, the repair costs on this estimate are covered under the Policy's Ordinance or Law Coverage, but Travelers denied coverage.

56.     The two December 22, 2025, estimates Vietri preprepared total $1,801,730.70, which is higher than Vietri's May 15, 2025, estimate for $1,507,222. The increase in costs from May to December 2025 is due to inflation, market fluctuations, and increased product and equipment costs.

57.     The work and repairs that are being mandated by the AHJ of Valley Township for the project to comply with applicable building codes, for which Plaintiffs seek coverage under the Ordinance or Law Coverage, involve generally the replacement of the existing outdoor 4.16 kV to 120/208V transformer bank with outdoor switchgear, the installation of a new 500 KVA padmount transformer to refeed the building's C-Wing, replacing related equipment and wiring, and interior work required to comply with code. *Id.*

58.     The work and repairs reflected in Vietri's two estimates dated December 22, 2025, are for the same repairs included in Vietri's May 15, 2025, estimate. Travelers, however, never took any steps to determine which particular repair costs in Vietri's May 15, 2025, estimate were for damages Travelers had already agreed were covered and for which payment under the Policy was admittedly owed to Plaintiffs.

59.     Therefore, an unreasonable amount of time passed – nine months – from when Travelers received Vietri's May 2025 estimate until it paid Plaintiffs the undisputed amount of insurance proceeds owed under the Policy for non-code-related repairs.

15641385.7

**Travelers' Failure to Consider Information and Evidence**
**That Plaintiffs Provided to Support Coverage for Code-Related Repairs**

60.    In or around June 2025, Travelers began to question whether some of the repairs would fall under the Ordinance or Law Coverage. Travelers questioned what specific ordinances or codes applied.

61.    Travelers, however, continued to move the goal posts with regard to what it asked Plaintiffs to establish to trigger coverage under the Ordinance or Law Coverage. Travelers repeatedly misrepresented to Plaintiffs what evidence would be sufficient for it to agree to accept coverage for the code-related repairs.

62.    In or about May 2025, Plaintiffs hired Jim Dollard ("Dollard"), Director of Code Compliance with United Inspection Agency, Inc., to address Travelers' questions.

63.    United Inspection Agency, Inc. is certified by the Pennsylvania Department of Labor and Industry. In addition, the AHJ of Valley Township – the sole entity with authority to regulate code enforcement for any building project in Valley Township, including the Harrison Senior Living repair project -- specifically recognizes United Inspection Agency, Inc. as a qualified Uniform Construction Code (UCC) electrical inspection agency. Dollard is routinely consulted by Valley Township on building code issues.

64.    Plaintiffs provided Travelers with reports dated May 22, 2025, and June 6, 2025, from United Inspection Agency, Inc., which reflect the results of Dollard's inspection of the damage at Harrison Senior Living after the loss to address Travelers' questions about code related repairs. True and correct copies of United Inspection Agency, Inc.'s May 22, 2025, and June 6, 2025, reports are attached as Exhibits F and G.

65.    Dollard concluded that the repairs/work recommended by Vietri in his May 15, 2025, estimate and as planned on the April 15, 2025, electrical drawings and schematics are

16

15641385.7

necessary to comply with Valley Township's applicable building codes. Dollard specifically identified in his report the various codes that must be complied with in making repairs at the Insured Property, including the 2018 International Building Code (IBC) which incorporates by reference the 2017 edition of National Fire Protection Association (NFPA) 70, and the National Electrical Code (NEC), particularly NFPA 101, Life Safety Code and 2018 IBC Chapter 27, Electrical. *See* Ex. G.

66.     Dollard specifically stated in his June 6, 2025, report that: "The cascading impact of changing the service voltage from 4.16 kV to 34 kV invokes requirements in the 2017 NEC" and that "The installation of a new 34 kV service and all downstream electrical distribution equipment at the Harrison House must meet the minimum requirements of the 2017 NEC." *Id.*

67.     Travelers did not respond in any meaningful way to Dollard's findings, did not refute Dollard's findings, did not conduct its own investigation of Dollard's conclusions with the AHJ, and did not conduct its own evaluation of the code-related repairs needed at the Insured Property to address the damage and comply with Valley Township's building codes.

68.     Further, Travelers did not advise Plaintiffs of where the claim stood at this point, as Travelers did not tell Plaintiffs whether Dollard's identification of the specific codes that mandated the repairs were sufficient to trigger coverage under the Ordinance or Law Coverage.

69.     In fact, upon information and belief, Travelers simply ignored the two Dollard reports. Travelers never provided any response to Plaintiffs explaining why Dollard's reports and conclusions did not sufficiently answer its questions and trigger the Ordinance or Law Coverage.

70.     Despite Travelers having the specific information from Dollard regarding the applicable building codes that required the repairs Vietri set forth in his May 15, 2025, estimate,

15641385.7

which responded to Travelers questions, Travelers did not accept coverage under the Ordinance or Law Coverage.

## Travelers Also Ignored PECO Information it Said Would Trigger Coverage for Code-Related Repair Costs

71.     Thereafter, Travelers advised Plaintiffs that it would provide coverage under the Ordinance or Law Coverage if PECO indicated it required Harrison Senior Living to move from 4 kV service to 34 kV service.

72.     Schubert allegedly was reviewing information about the claim in late July 2025, including PECO information, to prepare his report so that a coverage determination could finally be made, and he was going to report back to Travelers and Plaintiffs.

73.     On July 25, 2025, Angie Haldeman ("Haldeman"), with KMRD Partners, Inc., Plaintiffs' insurance broker who assisted with the claim, emailed Travelers' adjuster, copying Schubert, stating that she wanted to speak with the adjuster about where things stood with regard to a coverage opinion. By this time, it had been over two months since Plaintiffs provided Travelers with Vietri's scope and cost for all repairs. A true and correct copy of the email Angie Haldeman sent to Chris Swiatlon, Travelers' adjuster, dated July 25, 2025, is attached as Exhibit H.

74.     Schubert replied to Haldeman's July 25, 2025, email on the same day, apologizing and advising her that he was late in getting additional information to Travelers' adjuster but expected to have it to the adjuster early the next week "for a quick review and an update/call."  A true and correct copy of the email Randy Schubert sent to Angie Haldeman, dated July 25, 2025, is attached as Exhibit I.

75.     Having heard nothing back after several days, Haldeman followed up again with Travelers' adjuster and Schubert, sending an email on July 30, 2025, stating that Travelers was

18

15641385.7

supposed to provide an update but did not and asking where things stood on the claim. A true and correct copy of the email Angie Haldeman sent to Chris Swiatlon, Travelers' claim adjuster, dated July 30, 2025, is attached as Exhibit J.

76. While Schubert responded to Haldeman's July 30, 2025, email on the same day on PECO requirements, Travelers did not provide a coverage determination for the code-related repairs, did not respond to Dollard's findings, and did not refute or respond to Vietri's estimate for the needed repairs. Schubert did not issue a report as to his findings at that time – despite having sufficient information to do so -- and no "quick review" and/or "update/call" occurred as Schubert indicated he and/or Travelers would provide. *See* Ex. I.

77. On August 8, 2025, Haldeman again reached out to Travelers to learn where the claim stood. She had a conversation with Travelers' claims adjuster on the Ordinance or Law Coverage. The adjuster advised in that call that Travelers would approve coverage under the Ordinance or Law Coverage if PECO indicated it required Harrison Senior Living to move from 4 kV service to 34 kV service. Haldeman sent the adjuster an email confirming this conversation. A true and correct copy of the email Angie Haldeman sent to Chris Swiatlon, Travelers' claims adjuster, dated August 15, 2025, is attached as Exhibit K.

78. Shortly thereafter, Haldeman sent Travelers' claims adjuster that exact information – she forwarded to Travelers an August 14, 2025, email from James Raciti ("Raciti"), with Exelon Corporation who served as a Senior Engineer for PECO, to Plaintiffs stating that PECO required the change to 34 kV service. Raciti stated that 4 kV is no longer being constructed or serviced, PECO cannot service that level, and the Public Utility Commission through tariff mandates the change. Raciti concluded his email stating, exactly as Travelers required, that: "We [PECO] will support the project if it meets our standards … We

will not support a project that installs a system that we deem less reliable." A true and correct copy of the email James Raciti sent to Plaintiffs, dated August 14, 2025, is attached as Exhibit L.

79.    Despite Plaintiffs sending Travelers exactly what it asked for – a statement from PECO that Harrison Senior Living must move to 34 kV service -- Travelers' claims adjuster responded to Haldeman with regard to Raciti's email, stating that he would review the information, but claimed Raciti did not say that "we will not support repairs to the system at the loss location." A true and correct copy of the email Chris Swiatlon, Travelers' claims adjuster, sent to Angie Haldeman, dated August 18, 2025, is attached as Exhibit M.

80.    Relying on Travelers' representation that it would approve coverage for code-related repairs under the Policy's Ordinance or Law Coverage if PECO indicated that it required Harrison Senior Living to move to 34 kV service, Haldeman followed up again with Raciti to get Travelers even more supporting information.

81.    Raciti sent Haldeman a follow-up email dated August 20, 2025, stating definitively that: "PECO will not support the refurbishment or replacement of the 4 kV switchgear. The 4 kV switchgear is not up to PECO's current standards, and with the required intervention from PECO being necessary to get this service permanently operational we will only support service/equipment that meets our current standards. Our current feed standard in this area is 34 kV and this is the service feed PECO will support."  A true and correct copy of the email James Raciti sent to Angie Haldeman, dated August 20, 2025, is attached as Exhibit N. In fact, Raciti stated exactly what Travelers' adjuster said in his August 18, 2025, email to Haldeman was needed, *i.e.*, that PECO would not support repairs to the system at the loss location.

82.    By the end of August 2025, Travelers had not yet paid anything for the undisputed portions of Vietri's May 15, 2025, repair cost estimate, nor did it accept coverage under the

20

15641385.7

Ordinance or Law Coverage, despite the fact that Plaintiffs provided Travelers with the exact information it asked for to support coverage under Policy – both in the two Dollard reports and the Raciti emails showing PECO required the 34 kV service.

83. On September 5, 2025, Travelers' claims adjuster sent Plaintiffs an email acknowledging that Plaintiffs provided exactly what Travelers advised would trigger the Ordinance or Law Coverage; the adjuster agreed that "PECO has stated that they are refusing to cooperate in making permanent repairs" and requires the "upgrade of service." But then he said that PECO didn't provide a law or ordinance requiring the new service. A true and correct copy of the email Chris Swiatlon, Travelers' claims adjuster, sent to Plaintiffs, dated September 5, 2025, is attached as Exhibit O.

84. However, the Dollard reports which specifically address the applicable building codes related to PECO's concerns coupled with PECO's requirement that Harrison Senior Living install 34 kV service – exactly what Travelers said would trigger coverage under the Ordinance or Law Coverage – gave Travelers precisely what it asked for to demonstrate coverage for the code-related repairs under the Policy.

85. By September 2025, Plaintiffs had provided Travelers with Vietri's May 15, 2025, repair cost estimate, the two Dollard reports addressing Travelers' building code questions, and the directives from PECO which Travelers specifically requested from Plaintiffs, all of which were sufficient to trigger coverage, yet Travelers refused to accept coverage under the Ordinance or Law Coverage. Travelers failure to accept coverage was unreasonable and in bad faith.

**Randy Schubert's Alleged Investigation and Belated Report**

86. As noted above, Randy Schubert with JS Held conducted an inspection of the damage at the Insured Property on January 17, 2025.

21

15641385.7

87. Schubert, however, did not issue a report until October 8, 2025, nine months after the inspection, and only after Angie Haldeman contacted Travelers' claims adjuster on October 7, 2025, to inquire about the status of the claim.

88. Haldeman followed up yet again with Travelers' adjuster the next day via email on October 8, 2025. She advised the adjuster that she had been checking in with him almost weekly since the end of August 2025, and that the adjuster's response continued to be that he expected an answer "by the end of the week" but no response from Travelers was forthcoming. Haldeman also reminded the adjuster that the date of loss was November 13, 2024, almost one year prior, and Travelers still had not provided a coverage opinion. A true and correct copy of the email Angie Haldeman sent to Chris Swiatlon, Travelers' claim adjuster, dated October 8, 2025, is attached as Exhibit P.

89. Haldeman further advised the adjuster in that email that Travelers' hold up was making the situation at the Insured Property "more dire with each passing day" and that the delay was "creat[ing] additional risk … being business interruption and higher repair costs due to emergency response activity." *Id.* Haldeman concluded her email to Travelers stating: "Please, please continue to monitor this situation for a coverage opinion." *Id.*

90. Travelers sent Plaintiffs a copy of Schubert's October 8, 2025, report – based on his inspection conducted nine months prior – on October 9, 2025. A true and correct copy of Randy Schubert's October 8, 2025, report is attached as Exhibit Q. For reasons unknown to Plaintiffs, Schubert issued a second report related to the inspection dated October 31, 2025, which appears to be identical to his October 8, 2025, report. Travelers has never explained why Schubert issued a second report based on his inspection. A true and correct copy of Randy Schubert's October 31, 2025, report is attached as Exhibit R.

15641385.7

91. While Plaintiffs continued to provide Travelers with the information it requested and to comply with all of Travelers' requests, Travelers never told Plaintiffs why Schubert did not issue a report immediately after his inspection addressing, at a minimum, the cause of the loss, but waited nine months to do so. Nor did Travelers advise Plaintiffs that Schubert agreed with Vietri's scope of repair work and the cost estimate for the repairs.

92. Travelers was obligated to have Schubert provide his opinion as to the cause of loss within a reasonable time after inspecting the loss site and to provide his opinion on the scope of work and the repair costs within a reasonable time after Travelers received Vietri's May 15, 2025, estimate, which included the code-related work. Travelers' delay in doing so until October 8, 2025, was unreasonable and in bad faith.

93. In his October 8, 2025, report, Schubert stated: "The damage sustained by the electrical service cables from the utility to the subject facility's outdoor electrical substation and metering pad will require permanent repair to professionally install and secure new service." *See* Ex. Q.

94. Schubert agreed with Vietri's scope of work, as he further stated in his report that "Based on our analysis, we concur with the proposal (Vietri's) to install new equipment that includes new service lines, a new 34 kV to 4.16 kV transformer to step down the higher service voltage, and installation of an associated metering cabinet and 38 kV metal-enclosed interrupter. Additional work to the cable support mast structure/support or required cable removal and trenching is also required." *Id.*

95. Schubert also stated in his report that: "[T]o date, we do not have directives from local AHJ, PECO, or other enforcement actions or correspondence that require the new indoor C-Wing switchgear and 4 V to 120/208 V transformers." *Id.* He concluded: "Absent a directive

23

15641385.7

requiring all electrical upgrades from the local AHJ as a prerequisite for permanent repair, we recommend the initial proposal to make the repairs using the new 34 kV PECO service and equipment. If additional repairs or equipment are required by the AHJ, the claim may be adjusted." *Id.*

96.    Therefore, Travelers was advised by Schubert, its own engineer, that: (1) the repairs identified in Vietri's scope of repairs are, in fact, needed and reasonable; and (2) if the local AHJ requires the repairs identified by Vietri to be done as a prerequisite for completing the permanent repair of the damage, then those repairs should be considered necessary to comply with the AHJ's code requirements and the claim would be adjusted accordingly. *Id.*

97.    Although Schubert reviewed additional information after his inspection, his report establishes that he had Vietri's permanent repair schematic dated April 15, 2025, Vietri's permanent repair proposal dated May 15, 2025, and Dollard's June 6, 2025, report, all of which enabled him to provide an opinion and prepare his report. Never-the-less Schubert waited nine months to issue a report. Travelers apparently did not ask Schubert to issue his report any sooner, but allowed the claim to languish for over nine months from Schubert's inspection.

98.    Even after Schubert issued his belated report – and advised Travelers he agreed with Vietri's repair estimate – neither Schubert nor Travelers made any attempt to delineate which repairs were code-related and which were not so that Travelers could pay Plaintiffs the undisputed amount of the claim. Schubert should have provided Travelers with a list of agreed upon repairs not in dispute within a reasonable time after receiving Vietri's May 15, 2025, repair estimate. Schubert's and Travelers' delay in doing so until October 8, 2025, was unreasonable and in bad faith.

24

99.     Schubert stated in his October 8, 2025, report that if the local AHJ required the repairs identified by Vietri to be done as a prerequisite for completing the permanent repair of the damage, then those repairs will be considered necessary to comply with the AHJ's code requirements. *See* Ex. Q.

100.    However, on October 9, 2025, the same day Travelers sent Plaintiffs Schubert's report, Travelers sent Plaintiffs an email, which conflicts with what its own expert determined. Travelers' adjuster stated in that email: "It is agreed that an upgrade in service to 34 kV is being required by the utility. This will include new overhead wiring, a new metering cabinet due to dimensional requirements of the new service, a new transformer to step down the 34 kV service to 4.16 kV which all other equipment currently runs on, and a new 38 kV interrupter switch for the step-down transformer. The current 4.16 kV to 120 kV transformers are still functioning and delivering power at this time. It has been noted that they are leaking oil and have excessive corrosion which are unrelated to the loss. As such, this scope would not be covered under the claim." A true and correct copy of the email Chris Swiatlon, Travelers' claims adjuster, sent to Plaintiffs, dated October 9, 2025, is attached as Exhibit S.

101.    For the first time since the loss occurred and contrary to Schubert's statements in his report, Travelers advised Plaintiffs that it would not provide coverage for the work related to code compliance because the transformer allegedly leaked oil and had corrosion. *Id.* Schubert, however, had stated that if the work was directed by the AHJ it would be considered required code-related repairs. *See* Ex. Q. Travelers again was providing Plaintiffs with mixed messages and inconsistent positions regarding coverage under the Ordinance or Law Coverage.

102.    Travelers did not obtain any new information during the nine months from when Schubert conducted his inspection in January 2025 to October 2025 when he issued his report on

which to base its claim that coverage is not provided under the Policy because the transformers were allegedly leaking and corroded.

103.     While Plaintiffs deny that the equipment's condition is a valid reason to deny coverage for the code-related repairs, Travelers had all the information it needed to make this determination immediately after Schubert inspected the equipment on January 17, 2025. Yet, Travelers delayed for nine months in relaying this information to Plaintiffs and in making this coverage determination.

104.     Travelers had accepted coverage for the claim on April 30, 2025, but did not tell Plaintiffs what damages were or were not covered. Travelers asked about the building codes, but when Plaintiffs presented the two Dollard reports, Travelers ignored them. Schubert stated in his report that code-related repairs would be considered for coverage if the local AHJ required them, then the same day Travelers denied that portion of the claim. Meanwhile, by October 2025, Travelers still failed to pay the undisputed amount of the damages or commit to paying a specific amount. Travelers' conduct in this regard was unreasonable and in bad faith.

105.     Furthermore, Travelers decision to ignore Schubert's conclusions and to deny the code-related repair portion of the claim based on the condition of the equipment – which has nothing to do with building code compliance – was also unreasonable and in bad faith.

106.     Almost one month after Schubert issued his report, a call was set up on November 6, 2025, with Travelers' adjuster, Schubert, and Plaintiffs to discuss the claim and finally resolve the coverage determination. Again, Travelers provided inconsistent information to Plaintiffs as Travelers supposedly denied coverage for code-related repairs but then wanted to discuss coverage for that portion of the claim. Emails were exchanged between the parties with regard to the call on that same date. Schubert never ended up participating in the call even though his

presence was necessary to evaluate the claim – he apologized because he dropped off the call due to his phone not having service and/or not working properly and ne never rejoined the call. Travelers adjuster also apologized for Schubert's absence on the call and asked to set up another call to get the "scope settled" and "questions answered."  A true and correct copy of the email chain between the referenced parties, dated November 6, 2025, are attached as Exhibit T.

107.     Thus, Schubert, who Travelers was relying on for information and input that would impact Plaintiffs' coverage under the Policy, was not present on the call which was set up for the distinct purpose of discussing coverage and required his involvement. The failure of Travelers' expert to participate in such an important call was unreasonable and in bad faith.

108.     Plaintiffs advised Travelers that the new information from the AHJ (the AHJ's preliminary opinion indicating the repairs on Vietri's estimate were required) should allow Travelers to finally make a coverage determination and that a coverage opinion was needed because the project had to be started to avoid potential future losses.  *Id.*  No coverage decision was forthcoming from Travelers.

109.     By November 6, 2025, Schubert had inspected the loss and damage ten months prior, had reviewed the Dollard reports, PECO information, and Vietri's estimate four months prior, had issued his report one month prior, and had many months to consult with Travelers to arrive at a coverage decision on what repairs were covered.  And yet – one year after the loss occurred -- Travelers did not advise Plaintiffs of its coverage position on the code-related repairs and did not pay Plaintiffs for any undisputed covered amounts.

110.     Travelers' failure to provide Plaintiffs with a coverage opinion and failure to pay undisputed amounts owed under the Policy for one year after the loss is unreasonable and in bad faith.

15641385.7

111.    Instead, as noted above, Travelers did not agree to pay anything until February 2026, four months after Schubert issued his report and confirmed that he concurred with Vietri's work estimate.

**Travelers Ignored Directives From the AHJ Which it Said Would Trigger Coverage**

112.    Travelers continued to repeatedly give Plaintiffs conflicting information about the Ordinance or Law Coverage.

113.    In an attempt to jump though yet another hoop to provide Travelers with the information referenced in Schubert's report regarding the repairs mandated by code, Greg Vietri contacted Kyle Bendler ("Bendler"), who is the Valley Township Building Code Official, *i.e.*, the AHJ for Valley Township whose job it is to determine what building repairs are needed to ensure a project is being completed according to the applicable codes and ordinances.

114.    Vietri asked Bendler, as the AHJ, to review the repairs that may be subject to building codes. In response, Bendler advised Vietri in an email dated November 21, 2025, that he concurs with the repairs needed as outlined in the United Inspection Agency's (Dollard's) report and Vietri's project electrical drawings. Bendler stated in that email: "United Inspection Agency is certified by the Pennsylvania Department of Labor and Industry as a qualified UCC electrical inspection agent and therefore we accept this report (Dollard's report) as representative of Valley Township; the Authority Having Jurisdiction over this matter." A true and correct copy of the email Kyle Bendler sent to Greg Vietri, dated November 21, 2025, is attached as Exhibit U.

115.    Plaintiffs forwarded Bendler's November 21, 2025, email to Travelers on November 24, 2026.

116.    Travelers appeared to simply ignore Bendler's email, sent as the AHJ for Valley Township, incorporating and adopting all building codes cited in Dollard's report. On December

28

9, 2025, Travelers responded by email stating: "Travelers has not been provided a specific code or ordinance by the authority having jurisdiction that the replacement of these transformers in order to be granted a permit to complete the scope of work to restore permanent power." A true and correct copy of the email Chris Swiatlon, Travelers' claims adjuster, sent to Plaintiffs, dated December 9, 2025, is attached as Exhibit V.

117.   Per that email, Travelers required then that the AHJ identify the specific code or ordinance which mandates the repairs *and* that AHJ require the replacement of the transformer to be granted a building permit to permanently restore power to and re-energize the building. *Id.* Plaintiffs advised Travelers that both conditions were met.

118.   Thereafter, Vietri and Plaintiffs advised Travelers the AHJ will not issue a permit unless and until Plaintiffs agreed to do all of the recommended work, including the code-related repairs.

119.   Travelers adjuster then sent Plaintiffs a December 17, 2025, letter filled with inaccuracies and misstatements. This is the first formal coverage position letter Plaintiffs received from Travelers, over one year after the loss. A true and correct copy of the letter Chris Swiatlon, Travelers' claims adjuster, sent to Plaintiffs, dated December 17, 2025, is attached as Exhibit W.

120.   Travelers' adjuster stated in his letter that the claim involves replacement of certain equipment that was "not damaged by the covered breakdown." *Id.* The terms of the Ordinance or Law Coverage, however, do not require physical damage to property affected by building codes for coverage to be found; rather, coverage is provided if the increased cost to reconstruct or repair damaged or undamaged portions of a building is a consequence of enforcement of the minimum requirements of the ordinance or law. *See* Ex. A.

15641385.7

121. Travelers' adjuster then stated in his letter that "the transformer is leaking oil and has excessive corrosion, [and] these conditions pre-exited the date of loss and were not caused by the covered breakdown." *See* Ex. W. Yet, the adjuster – after what was then eleven months from Schubert's inspection -- provided no evidence at all to show that the AHJ required the code related repairs due to alleged leaking or corrosion. In fact, upon information and belief, Travelers never investigated this issue. In any event, the AHJ requires the repairs for Plaintiffs to get permitting for the project to assure all repairs and equipment comply with applicable codes, and to get final sign off for the project.

122. After purportedly denying the code-related repair portion of the claim on October 9, 2025, Travelers' adjuster then claimed in his December 17, 2025, letter that there is no coverage because Plaintiffs did not provide the ordinance or law that requires the transformers to be replaced. The adjuster stated: "In order for Travelers to assess coverage for the replacement of the transformers, it needs for you to provide it with the specific ordinance or law that requires the replacement of these transformers." *Id.* Travelers was relaying inconsistent information to Plaintiffs. It was unclear whether Travelers was denying coverage or whether Travelers was still evaluating coverage because it seemed that Travelers was yet again asking Plaintiffs to provide more information as to the applicable building codes. *Id.*

123. In his December 17, 2025, letter, despite all the information provided by Plaintiffs which referenced the specific codes required for the repairs at issue, Travelers' adjuster stated: "Travelers' investigation has not revealed any ordinance or law that requires the replacement of these transformers." *Id.* Upon information and belief, however, by December 2025, Travelers had not conducted any meaningful investigation or research as to the application of building codes to the repairs needed and/or to evaluate the AHJ's clear directives on what repairs had to be done to

30

comply with appliable building codes and obtain the necessary permits. Travelers never provided Plaintiffs with the results of any alleged "investigation" it claims to have done with regard to the code-related repairs.

124. In fact, as described below, the only purported "investigation" Travelers did into the AHJ's directives as to the applicable building codes was done months later as reflected in Schubert's April 17, 2026, "report", which was incomplete and deficient.

125. Again, in an attempt to address Travelers' false claim that Plaintiffs did not provide building codes that required the repairs, Plaintiffs' counsel spoke with Bendler, the AHJ, to explain what Travelers was requesting, *i.e.,* specific building code cites.

126. In a December 16, 2025, email, Bendler provided even further details on the codes that apply to require all of the repairs in Vietri's estimate. Bendler cited the following: Pennsylvania Act 45 of 1999 as the governing law, specifically Section 403.84 of the Act addressing unsafe buildings and equipment; Section 403.21 (a) (1) of the Act which adopts the 2018 International Building Code (IBC); Chapter 27 & Chapter 35 of the 2018 IBC which adopt NFPA 70-17 (the Electrical code or NEC); Chapter 27 of the IBC which also references the International Property Maintenance Code (IPMC) and the International Fire Code (IFC) for installation and maintenance of equipment & system; and Section 604.3 of the IPMC and Section 604 of the IFC which regulate unsafe electrical equipment and requirements for abatement of hazards. A true and correct copy of the email Kyle Bendler sent to Plaintiffs' counsel, dated December 16, 2025, is attached as Exhibit X.

127. Bendler's December 16, 2025, email was sent to Travelers on January 16, 2026.

128. The specific codes Bendler cited in his December 16, 2025, email are consistent with and supplement the codes provided by Dollard in his report, which Bendler had already

adopted and determined applied to the repairs needed at the Insured Property, all of which must be complied with for this project to obtain the AHJ's final approval. Travelers had all of this information for many months, with Bendler's December 16, 2025, email again reconfirming the applicable building codes.

129. Thus, Plaintiffs fully complied with Travelers' requests to provide a specific code or ordinance the AHJ cites to requiring the replacement of the transformers in order to be granted a permit to complete the scope of work to restore permanent power at the Insured Property -- which Travelers represented would trigger the Ordinance or Law Coverage.

130. Travelers strung Plaintiffs along for over one year asking for more and more information to support coverage under the Ordinance or Law Coverage, and then every time Plaintiffs provided the required information, Travelers simply ignored the information, requested the same information again, or advised Plaintiffs it would consider the information with no response for days or weeks – all while not having done its own investigation to challenge the AHJ's position and/or to evaluate independently what building codes may or may not apply to the repair project.

131. Travelers' delay and failure in fully and fairly assessing this information and in failing to provide a coverage opinion left Plaintiffs at risk of additional damage, increased repair costs, a business interruption loss, and the possibility of having to move elderly, vulnerable residents from the building if the temporary repairs did not hold or if the electrical power failed.

132. Other than generally claiming that specific code citations provided by both the AHJ himself and United Inspection Agency, which the AHJ adopted, were not detailed enough, and then claiming the transformer was allegedly leaking and/or corroded, Travelers offered nothing to even attempt to show why the cited codes do not apply as the AHJ ruled.

133.    Contrary to Travelers' position, Schubert recognized that the AHJ could require compliance with certain building codes – as is the case on any building or repair project – since he expressly stated in his report that the repairs that fall under the Ordinance or Law Coverage must be considered if a "directive requiring all electrical upgrades from the local AHJ [is issued] as a prerequisite for permanent repair." *See* Ex. Q.

134.    While Plaintiffs dispute Travelers' position, Travelers had all of the information it needed by the June 2025, giving Travelers every benefit of the doubt, to make a decision as to coverage under the Policy for code-related repairs.

135.    By then, Travelers knew what the code-related repairs included since it had Vietri's May 15, 2025, repair cost estimate, the Dollard reports, and Schubert's January 17, 2025, inspection which should have revealed that the transformer which the AHJ mandated be replaced was allegedly leaking and corroded, not that this provided a valid basis to deny coverage. Travelers delay of almost one year to advise Plaintiffs that it would not provide coverage under the Ordinance or Law Coverage was unreasonable and in bad faith.

### Travelers Relied on a Flawed, Incomplete "Expert"<br>Report on the Code Related Repairs

136.    Travelers should have paid Plaintiffs for all repairs that fall under the Ordinance or Law Coverage. Instead, to respond to the AHJ's directives requiring the code-related repairs, which it received in November 2025 and January 2026, Travelers decided belatedly three months later to engage Schubert to provide an opinion on the issue.

137.    After repeated requests from Plaintiffs and/or its representatives, Travelers finally produced a report from Schubert dated April 17, 2026.

138.    Travelers' delay in investigating and evaluating the code-related repairs for close to one year after receiving Vietri's May 15, 2025, estimate and three months after receiving

33

Bendler's email listing very specific building codes that apply to the repairs needed to complete the project was unreasonable and in bad faith.

139. Travelers took no action to reasonably conduct a prompt, full, and fair evaluation or analysis of the code related repairs under the Ordinance or Law Coverage or to fully and fairly evaluate the building codes cited by both Dollard and Bendler. Instead, Schubert issued a cursory 3-page report, much of which was simply cut and pasted from his earlier report.

140. Travelers asked for and Plaintiffs provided even more information regarding the repairs. Schubert sent Plaintiffs an email dated January 16, 2026, stating: "Thank you for the additional information that you provided about required repairs and safety codes, we are reviewing." A true and correct copy of the email Randy Schubert sent to Plaintiffs, dated January 16, 2026, is attached as Exhibit Y. On January 17, 2026, Vietri also provided answers to even more questions posed by Travelers and/or Schubert regarding the repairs.

141. However, despite reviewing the matter in January 2026, Schubert waited three months before finally issuing a report – albeit a deficient report -- on the code-related repairs.

142. Schubert only issued his belated report after Plaintiffs reached out to Travelers three additional times asking for an update on coverage – months after Schubert acknowledged receipt of the additional information Plaintiffs provided. *See* Ex. Y.

143. On April 13, 2026, Plaintiffs sent an email to Travelers' adjuster asking for an update on coverage, and the adjuster responded apologizing for the delay, advising that he did not receive his "consultants" report, and indicating that he reached out to his "consultant" regarding his report.  A true and correct copy of the email chain between Plaintiffs and Chris Swiatlon, Travelers' claims adjuster, dated Apil 13 and 14, 2026, are attached as Exhibit Z.

144. Plaintiffs contacted Travelers again both on April 15 and April 17, 2026, asking whether there was any update. A true and correct copy of the emails Plaintiffs sent to Chris Swiatlon, Travelers' claims adjuster, dated April 15 and 17, 2026, are attached as Exhibit AA.

145. Schubert finally issued his report on April 17, 2026. Schubert's report is deficient and further shows that Travelers never engaged in any fair, meaningful factual evaluation or coverage analysis of the portion of the claim for code-related repairs. A true and correct copy of Randy Schubert's April 17, 2026, report is attached as Exhibit BB.

146. Travelers either did not provide Schubert with all the relevant information on the repairs required to comply with the applicable building codes or Travelers did provide Schubert with the relevant information and he ignored it. Either way, Travelers' handling of this aspect of the claim is unreasonable and in bad faith.

147. The AHJ's directives were relevant and significant to Schubert's analysis in his October 8, 2025, report because he agreed that if the local AHJ issued a directive requiring the electrical upgrades, the claim should be adjusted to include those repairs. *See* Ex. Q. In issuing his April 17, 2026, report, Schubert did not receive the AHJ's emails from Travelers, he ignored them, or he failed to realize the significance of the AHJ's directives. *See* Ex. BB.

148. Schubert's April 17, 2026, report does not even mention the AHJ's November 21, 2025, and December 16, 2025, emails which set forth the AHJ's specific directives regarding the code-related repairs that must be done to obtain permitting and, in turn, to maintain proper zoning for a residential senior living center – which Travelers advised Plaintiffs were needed to trigger coverage under the Ordinance or Law Coverage. *See* Ex. BB.

149. Schubert's report – which was supposed to represent Travelers' analysis of the building codes and code-related repairs as required by the AHJ -- shows that he was woefully

35

uninformed as to the AHJ's position, or chose to ignore it. His report states in the conclusions/recommendations section that: "We have not received directives from local AHJ, PECO, or other enforcement actions or correspondence that require the new C-Wing switchgear and new 4.16 kV to 120/208 V transformers." *Id.* That is patently false, and clearly reflects Schubert's cursory and inadequate consideration of this matter. Schubert's false statement demonstrates that he was opining incorrectly and uninformedly about matters directly related to an issue that would negatively affect Plaintiffs' insurance coverage.

150.    Alternatively, Travelers withheld the AHJ information from Schubert and ignored the fact that Schubert did not mention it in his report.

151.    In addition, Schubert again acknowledged in his April 17, 2026, report (as he did in his initial October 8, 2025, report) that, if the AHJ requires the electrical upgrades as a prerequisite for permanent repair, the claim would be adjusted to account for those repairs under the Ordinance or Law Coverage. *Id.* The AHJ did exactly that.

152.    Schubert's statement in his report that "The most definitive answer may be to present the agreed-upon scope to the authority having jurisdiction (AHJ) for a permit" establishes that he was completely unaware (or ignored) that, in fact, Plaintiffs had already done that and that AHJ advised the electrical repairs set forth in Vietri's scope of repairs were a requirement for permitting the project. *Id.*

153.    Still further, there is no reference in Schubert's April 17, 2026, report that he (or anyone on Travelers' behalf) spoke with Dollard, Bendler, or anyone else in building code compliance for Valley Township, consulted a building code expert or anyone else on code compliance, or conducted a detailed analysis of the specific codes cited by Bendler and Dollard.

36

15641385.7

154. Other than Schubert including two general references to codes related to equipment specifications and ingress/egress to the building, Travelers appears to have done nothing to independently evaluate the code-related repairs and/or the AHJ's directives.

155. Travelers' reliance on Schubert's flawed and deficient report to make a coverage decision on the Ordinance or Law Coverage was unreasonable and in bad faith. Travelers' failure to provide the relevant information to Schubert or Travelers' failure to recognize that Schubert ignored critical information was unreasonable and in bad faith. Travelers did not engage in a full and fair investigation of this aspect of the loss.

156. Prior to Schubert issuing his April 17, 2026, report, Travelers had the information it needed to accept coverage for the code-related repairs under the Ordinance or Law Coverage. There was no valid reason for Travelers to wait months after receiving the AHJ's directives only to then deny coverage under the Ordinance or Law Coverage, claiming the transformer allegedly was leaking and corroded.

**Travelers Owes Coverage Under the Ordinance or Law Coverage**

157. Travelers owes coverage for the full amount of Vietri's $896,987.22 estimate for repairs that fall under the Ordinance or Law Coverage.

158. For almost one year since Travelers received Vietri's May 15, 2025, repair cost estimate to April 2026, Travelers claimed that the Ordinance or Law Coverage was not triggered because Plaintiffs did not cite to specific building codes requiring the repairs, namely the replacement of the transformer and related equipment. That position was proved meritless.

159. Travelers now has settled on the position, as recently represented by its counsel, that Travelers disputes coverage for Vietri's entire code-related repair estimate because the AHJ's directive on code compliance was the result of the equipment's alleged condition and not damage

37

from the incident. Travelers had inspected that very equipment prior to the loss in underwriting the policy and agreed to accept the risk.

160.    Travelers' position is unreasonable and in bad faith because it is contrary to the express terms and provisions in the Ordinance or Law Coverage.  Moreover, Travelers substantially delayed in arriving at that decision and in relaying that position to Plaintiffs when it had the ability to do so in January 2025.

161.    Plaintiffs jumped through hoops for months getting Travelers everything Travelers said it needed to trigger the Ordinance or Law Coverage, *i.e*., the Dollard reports to answer Travelers' questions about applicable building codes, PECO directives on what equipment it would service, directives from Bendler, Valley Township's AHJ, and Vietri's estimates breaking down the code-related and non-code-related scope and cost of repairs. Travelers could have made a coverage determination based on allegedly old equipment within a few weeks after the loss. Instead, Travelers waited over fifteen months after the loss and made Plaintiffs jump through numerous hoops before denying coverage in April 2026 on a basis that was available in January 2025, albeit an unsupportable and bad faith denial even then.

162.    Travelers has produced no evidence to Plaintiffs to support that the AHJ's directives resulted from the equipment's condition.

163.    The Ordinance or Law Coverage applies to increased costs to repair damaged and undamaged property due to the consequence of code enforcement after a loss. That Additional Coverage does not require physical damage to have occurred from the covered event to property that must be repaired or replaced due to building codes.

164.    Travelers has conceded the critical facts that trigger Plaintiffs' right to recover under the terms of the Ordinance or Law Additional Coverage: (a) there was covered physical

15641385.7

damage to a building that is covered property; (b) there was an increase in the cost to repair or reconstruct damaged and undamaged portions of the building; (c) the increase in cost is a consequence of enforcing the minimum requirements of the ordinance or law; and (d) the ordinance or law regulates the construction or repair of the building and was in full force at the time of the loss. *See* Ex. A.

165.    Travelers recently also appears to have conceded that the AHJ has mandated the code-related repairs and requires those repairs to obtain proper permitting.  Further, Travelers has never disputed Vetri's estimate of the cost of those repairs.

166.    Moreover, before the storm and electrical arcing event, Harrison Senior Living had a fully operational electrical system, had equipment with no damage or safety warnings, had no code violations issued against it, and was not required to repair or replace any part of its electrical system due to building code enforcement or for any other reason. But for the loss, Plaintiffs would not need to make the repairs required by the AHJ post-loss.

167.    In fact, the system in place before the loss serviced a fairly large building with 111 living units without issue or code violations. It was only after the loss that the AHJ mandated the code-related work and repairs to be done to assure the existing equipment was made compatible with and integrated into the new system and equipment being installed compliant with applicable building codes.

168.    Travelers has breached the insurance contract issued to Plaintiffs by refusing to pay for the code-related repairs needed to comply with applicable building codes after the covered loss.

169.    Travelers has acted in bad faith under 42 Pa. Cons. Stat. § 8371 by, among other things, unreasonably delaying payment of the claim, unreasonably delaying its agreement to

39

accept coverage, failing to conduct a fair, meaningful, and adequate investigation of the claim, arriving at an inaccurate position as to coverage under the Ordinance or Law Coverage based on both the Policy terms and Travelers' representations to Plaintiffs, providing inconsistent information to Plaintiffs about what triggers the Ordinance or Law Coverage, relying on flawed purported expert reports, and taking contrary positions on the claim.

<u>**COUNT I – BREACH OF CONTRACT**</u>

170.    Paragraphs 1 through 169 are incorporated by reference.

171.    Travelers issued an insurance contract to Plaintiffs, effective December 31, 2023, to December 31, 2024, which included an "Additional Coverage & Coverage Extension" for Ordinance or Law Coverage with a Revised Limit of Insurance in the amount of $1,000,000.

172.    A covered loss occurred on November 13, 2024, at 300 Strode Avenue, Coatesville, Pennsylvania 19320, an insured location covered under the Policy.

173.    Travelers accepted coverage for the loss on April 30, 2025.

174.    Plaintiffs provided prompt and adequate notice of the loss, cooperated in all aspects of Travelers' investigation and inspection, and complied with all terms, conditions, and provisions in the Policy.

175.    No exclusions in the Policy apply to preclude coverage for any aspect of the loss.

176.    All conditions precedent to coverage have been fulfilled or waived.

177.    Travelers has a contractual duty to accept coverage under the terms and provisions of the Policy for the code-related repairs as set forth in Vietri's December 22, 2025, estimate and mandated by Valley Township's AHJ, and Travelers has an obligation to pay Plaintiffs for those repairs.

178.    Travelers breached the insurance contract by denying coverage for the code-related repairs that fall under the Ordinance or Law Coverage.

179.    Plaintiffs have suffered substantial damages as a result of Travelers' breach of the insurance contract, including direct and consequential damages.

WHEREFORE, Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC, request that this Court enter judgment in their favor and against Defendant, Travelers Property Casualty Company of America, in an amount in excess of $75,000, plus all direct and consequential damages, all other costs associated with the loss, interest, costs, and such other relief this Court deems just and proper.

## COUNT II – BAD FAITH UNDER 42 PA. C.S.A. §8371

180.    Paragraphs 1 through 179 are incorporated by reference.

181.    Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371, provides a remedy to an insured for an insurance company's bad faith conduct by which the insurer knowingly or with reckless disregard acts unreasonably toward its insured with regard to, among other things, the adjustment, investigation, and/or payment of an insurance claim.

182.    Pennsylvania's bad faith statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371 (2008).

15641385.7

183.    Under Pennsylvania law, an insurer, such as Travelers, has an obligation to act in good faith in dealing with its insured in adjusting, investigating, and paying a claim under an insurance policy and in every decision it makes regarding the claim.

184.    Travelers acted unreasonably and in bad faith in refusing to provide coverage to Plaintiffs under the Policy's Ordinance or Law Coverage for the repairs at the Insured Property related to building code compliance required after the covered storm and electrical arcing loss.

185.    Travelers had no reasonable basis to deny Plaintiffs' claim for code-related repairs as mandated by the AHJ of Valley Township, as the Ordinance or Law Coverage specially provides coverage to Plaintiffs for such damages pursuant to its express terms and provisions.

186.    Further, Travelers acted in bad faith toward Plaintiffs with regard to all aspects of the claim adjustment as fully described in the above allegations. Specifically, but without limitation, Travelers acted unreasonably and in bad faith toward Plaintiffs as follows:

(a)    Travelers unreasonably and in bad faith delayed in paying Plaintiffs for the undisputed amounts owed under the Policy;

(b)    Travelers unreasonably and in bad faith failed to conduct a complete and prompt inspection of the loss and damage, and did not require its engineer to issue a fair and prompt evaluation of the cause of the loss, and a prompt report of his findings;

(c)    Travelers unreasonably and in bad faith delayed in accepting coverage for the claim;

(d)    Travelers unreasonably and in bad faith delayed in having or failed to have Schubert or a qualified building code expert evaluate the applicability of the codes identified by Plaintiffs, the AHJ, Dollard, and others;

42

15641385.7

(e)   Travelers unreasonably and in bad faith failed to conduct a full and fair investigation of the portion of the claim involving code-related repairs and coverage under the Ordinance or Law Coverage, including a failure to conduct an independent investigation of what building codes applied to require the repairs in the Vietri estimate, failure to hire an expert in what building codes are applicable to the location, loss, and electrical system of the type at issue in this case, failure to contact James Dollard, Kyle Bendler, or anyone else from the Valley Township building code department to develop relevant evidence, and failure to prepare a breakdown of code-related ad non-code-related repairs to allow for a prompt resolution of the non-code-related repair portion of the claim;

(f)   Travelers unreasonably and in bad faith failed to fully and fairly consider, and give proper weight, to the evidence it asked Plaintiffs to provide on the code-related repairs when Plaintiffs provided it, and unreasonably dismissed or ignored evidence that supported coverage under the Ordinance or Law Coverage;

(g)   Travelers unreasonably and in bad faith delayed in evaluating the code-related repairs and in hiring Schubert over one year and three months after the loss to evaluate the code-related repairs, and further acted unreasonably in hiring Schubert at all as he did not have the proper experience in building code compliance to fully and fairly evaluate that aspect of the claim;

(h)   Travelers unreasonably and in bad faith failed to provide Schubert with the relevant information Plaintiffs had obtained and sent to Travelers that supported coverage under the Ordinance or Law Coverage, and further failed to assure that Schubert considered all evidence that supported coverage in issuing his report and/or providing his purported opinion on the code related issues;

15641385.7

(i)     Travelers unreasonably and in bad faith relied on Schubert's purported conclusions as to the code-related repairs when he obviously conducted an incomplete investigation or analysis and/or failed to consider relevant evidence that he himself stated was pertinent to the claim;

(j)     Travelers unreasonably and in bad faith repeatedly provided Plaintiffs with contradictory and/or incomplete information as to whether there was coverage under the Ordinance or Law Coverage;

(k)     Travelers unreasonably and in bad faith repeatedly changed its position on what Plaintiffs need to show to trigger coverage under the Ordinance or Law Coverage, and further acted unreasonably in repeatedly moving the goal posts in asking for more and more information from Plaintiffs even after Plaintiffs provided exactly what Travelers had previously requested;

(l)     Travelers unreasonably and in bad faith delayed in advising Plaintiffs for over one year it was denying the code-related repairs portion of the claim based on an alleged reason that Travelers knew of at the time of its initial inspection of the loss and damage; and

(m)     Travelers unreasonably and in bad faith misrepresented or misstated facts and issues regarding the claim in its communications with Plaintiffs and/or their representatives.

187.    Plaintiffs incorporate herein all of the factual allegations pled in detail above with regard to Travelers' bad faith and unreasonable conduct in the adjustment and handling of this insurance claim.

188.    Travelers' bad faith has caused Plaintiffs substantial damages.

189.    As a result of Travelers' bad faith conduct, Plaintiffs have incurred substantial costs and expenses, including attorneys' fees and costs associated with their attempts to require

44

Travelers to comply with its obligations under the insurance contract and to obtain the coverage and insurance proceeds they are owed under Policy for which they paid a premium.

WHEREFORE, Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC, demand judgment against Defendant, Travelers Property Casualty Company of America, for bad faith, including compensatory, consequential, and punitive damages in amounts in excess of $75,000, plus interest, costs, and attorneys' fees.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC, hereby demand a trial by jury of issues so triable.

<u>**DESIGNATION OF TRIAL COUNSEL**</u>

Jay M. Levin, Esquire, will be trial counsel for Plaintiffs, Harrison Enterprises, L.P. and Harrison Senior Living of Coatesville, LLC.

Respectfully submitted,

**FLASTER GREENBERG P.C.**

By:      */s/ Jay M. Levin*
Jay M. Levin
PA ID 34561
Madeline Caprioli Hamilton
PA ID 69733
100 Front Street, Suite 100
Conshohocken, PA 19428
Telephone: (215) 546-4842
Fax: (215) 576-8188
Email: jay.levin@flastergreenberg.com
Email: madeline.hamilton@flastergreenberg.com

*Attorney for Plaintiffs*
Harrison Enterprises, L.P. and
Harrison Senior Living of Coatesville, LLC

Date: July 13, 2026

15641385.7